UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
THE PREMISES OF 1335 N. RUSSELL
STREET, MANCHESTER, NEW
HAMPSHIRE, A 2007 BLACK HONDA
CRV BEARING NEW HAMPSHIRE               No. 21-mj- 240-AJ-01/03
LICENSE PLATE NUMBER 2371002, AND
A 2021 GRAY JEEP WRANGLER
BEARING NEW HAMPSHIRE LICENSE
PLATE NUMBER 4928144.

<u>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS</u>

I, Steven Galbadis, being duly sworn, depose and state as follows:

**<u>Introduction and Agent Background</u>**

1.      I submit this affidavit in support of an application for a search warrant to search

the following: (1) the residence of a single family residence located at 1335 N. Russell Street,

Manchester, New Hampshire ("N. Russell Street Residence"); (2) a 2007 black Honda CRV

("black Honda") bearing New Hampshire license plate number 2371002 registered to Juan

Antonio PICHARDO-MENDEZ at the N. Russell Street Residence and (3) a 2021 gray Jeep

Wrangler ("gray Jeep") bearing New Hampshire license plate number 4928144 registered to Juan

Antonio PICHARDO-MENDEZ at the N. Russell Street Residence[1], all described in more detail

in Attachments A-1, A-2, and A-3. The items to be seized are more particularly escribed in

---

[1] On September 13, 2021, a member of the DEA Portsmouth TDS queried PICHARDO-MENDEZ's
driver's license information again and determined that his listed address remains N. Russell Street.
Moreover, on September 13, 2021, I conducted drive-by surveillance of the N. Russell Street address and
observed the black Honda parked in the driveway of the residence.

Attachments B-1, B-2, and B-3.

2.      Based on the facts and circumstances set forth in this affidavit, I submit that there is probable cause to believe that PICHARDO-MENDEZ ("PICHARDO-MENDEZ"), Ruth ORTEGA ("ORTEGA"), and others are engaged in narcotics trafficking activities that constitute violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 21 U.S.C. § 841(a)(1) (distribution of controlled substances), and that evidence of those offenses will be found in the places to be searched.

3.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

4.      I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA"), currently assigned to the DEA Portsmouth, New Hampshire Tactical Diversion Squad ("TDS").  I have been a Special Agent with DEA since 1997.  My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1) and 846. I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, and other substances. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity

to avoid detection by law enforcement.[2]  In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations and meetings, and Title III intercepts.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 841(a)(1) (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances) have been committed by the individuals to include PICHARDO-MENDEZ, ORTEGA, and others.  There is also probable cause to search the premises and vehicles described below for evidence of these crimes.

## PROBABLE CAUSE

6.      Since August of 2020, the DEA has been conducting a criminal investigation into a drug trafficking conspiracy operating in Manchester, New Hampshire, and Massachusetts.  Through the course of its investigation, DEA has identified PICHARDO-MENDEZ, ORTEGA, and other individuals as members of this conspiracy.  To date, the investigation has involved the seizure of evidence, interviews with cooperating defendants, physical surveillance, controlled purchases of fentanyl, and phone analysis.  Based on the investigation, there is probable cause to believe that PICHARDO-MENDEZ and ORTEGA are using the premises and vehicles described in Attachments A-1, A-2, and A-3 in furtherance of this ongoing conspiracy.[3]

---

[2] Observations made and conclusions drawn throughout this affidavit that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

[3] As detailed herein, I believe that PICHARDO-MENDEZ and ORTEGA may currently utilize, or may

3

7.      On December 9, 2020, a cooperating source, ("the CS" or "CS"), acting under the direction of DEA, arranged to meet with PICHARDO-MENDEZ for a free sample of fentanyl at a barber shop in Manchester, New Hampshire.[4]  In anticipation of this meeting, members of the TDS established surveillance around the barber shop located at 332 Union Street in Manchester, New Hampshire.  Prior to the meeting, members of the DEA Portsmouth TDS met with the CS. During this time, DEA searched the CS and CS's person and vehicle with negative results for unexplained currency, weapons and/or contraband with negative results.  DEA provided the CS with audio and video recording equipment.  Members of the DEA Portsmouth TDS then followed the CS in CS' vehicle to 332 Union Street in Manchester, New Hampshire.

8.      DEA agents observed the CS enter the barber shop.  During this time, DEA agents observed a white Volvo V60 station wagon parked in front of the barber shop.  A few minutes later, agents observed the CS exit the barber shop, enter the CS vehicle, and leave the area.  DEA agents continued to monitor the area of the barber shop after the CS left.  A few moments after the CS departed the barbershop, DEA agents determined that the white Volvo had also departed the area.  A query of New Hampshire Department of Motor Vehicle records has revealed that

---

have utilized in the past, a second residence located at 16 Gates Street, Manchester, New Hampshire ("Gates Street") in furtherance of their drug trafficking.

[4] The CS is facing potential criminal charges based on his/her 2019 arrest by the New Hampshire State Police for possession with the intent to distribute narcotics.  The CS has provided information and/or active cooperation at the direction of DEA in the hopes of receiving prosecutorial and/or judicial consideration at sentencing.  Before the CS's arrest, he/she was arrested in the State of Florida for misdemeanor marijuana possession and driving under the influence of alcohol.  In addition, the CS has previously been arrested in Massachusetts for operating a motor vehicle after suspension and failure to pay child support.  I believe that the information provided by the CS is reliable as it is consistent with other government intelligence and has been independently corroborated through this investigation and other sources.

PICHARDO-MENDEZ is the registered owner of a white 2015 Volvo V60 station wagon bearing New Hampshire registration 4085894 ("white Volvo")[5].

9.      This affiant and a second DEA agent then met with the CS at a neutral location. At this time, the CS provided agents with two different substances believed to contain fentanyl. The CS also returned the audio/video equipment the CS had previously been given.  Other agents then searched the CS and the CS vehicle with negative results for contraband.  The CS indicated that the CS met with PICHARDO-MENDEZ and another male introduced to the CS as "Baretta" inside the barber shop.[6]  According to the CS, "Baretta" provided the CS with the substances believed to contain fentanyl.  DEA subsequently field tested the substances with inconclusive results.  These substances have been submitted to the DEA Northeast Lab for analysis and the results are pending.

12.     A review of the audio/video equipment retrieved from the CS indicated that while the CS was meeting with PICHARDO-MENDEZ and "Barretta," "Barretta" appeared to hand the CS the suspected fentanyl.

13.     On December 11, 2020, DEA agents directed the CS to place a telephone call to PICHARDO-MENDEZ at a cellular telephone number PICHARDO-MENDEZ provided to the CS.[7]  This call was monitored by DEA agents, but the CS did not receive an answer.  Approximately two minutes later, the CS received an incoming call from PICHARDO-

---

[5] I determined through the course of this investigation that on March 12, 2021 PICHARDO-MENDEZ drove this vehicle to New York and left it there.  Investigators have not seen that vehicle since that time.
[6] The CS previously informed DEA agents that during the summer of 2020, he/she was introduced to PICHARDO-MENDEZ by another individual.
[7] During this investigation, PICHARDO-MENDEZ provided the CS and CS2 with the following telephone numbers. As referenced herein, the CS and CS2 communicated with PICHARDO-MENDEZ and/or ORTEGA over these cellular telephone numbers to include: (603) 948-8365, (603) 400-4525, and (401) 442-9597.

MENDEZ.[8] DEA agents monitored and recorded the conversation. The CS and

PICHARDO-MENDEZ spoke in Spanish and according to the CS, during the call PICHARDO-

MENDEZ asked if the CS had tested the drugs the CS had received on December 9, 2020.[9] The

CS then asked PICHARDO-MENDEZ about the price of the fentanyl.  PICHARDO-MENDEZ

indicated that he would talk with "[his] buddy" and would let the CS know but the CS did not

hear back from PICHARDO-MENDEZ.  Subsequent attempts by the CS to call PICHARDO-

MENDEZ back for several days after were unsuccessful.

14.     On January 12, 2021, DEA directed the CS to place a call to PICHARDO-

MENDEZ at a second cellular telephone number PICHARDO-MENDEZ provided to the CS.

DEA monitored and recorded the conversation. The CS and PICHARDO-MENDEZ spoke in

Spanish and according to the CS, the CS asked PICHARDO-MENDEZ to meet the next day to

purchase drugs.  The CS and PICHARDO-MENDEZ also discussed the quantity of drugs the CS

would be able to purchase for $500.  PICHARDO-MENDEZ told the CS that he had a new

phone number that he would send to the CS.  On January 13, 2021, the CS responded back via

text that the CS was unable to meet.

15.     On January 18, 2021, investigators instructed the CS to send PICHARDO-

MENDEZ a text message asking if he would be around the next day.

16.     On January 19, 2021, PICHARDO-MENDEZ responded back to the CS in

Spanish via text message, "I call that boy" indicating that he had to check with his associate.

The CS understood this to mean that PICHARDO-MENDEZ had to check with an associate to

---

[8] The CS informed DEA that the CS recognized the voice of the caller as belonging to PICHARDO-
MENDEZ.
[9] To the extent possible, DEA employees conversant in Spanish have reviewed most of the audio
recordings to corroborate CS' and CS2's information.

see if drugs were available before agreeing to meet with the CS.  Approximately an hour later, investigators instructed the CS to call PICHARDO-MENDEZ.  Investigators monitored and recorded the conversation that was in Spanish. According to the CS, the CS asked if PICHARDO-MENDEZ had drugs to sell.  PICHARDO-MENDEZ indicated that he had to call his associate to see if the drugs were available and would call the CS back.  Later that day, the CS placed another call to PICHARDO-MENDEZ but did not receive an answer.  Investigators then instructed the CS to send PICHARDO-MENDEZ a text message on asking the status of the drug delivery.  PICHARDO-MENDEZ responded to the CS via text message that he would be going to Lawrence, Massachusetts later in the day to obtain the drugs.

17.     On January 21, 2021, DEA agents met with the CS at a neutral location.  Agents searched the CS and CS' vehicle for unaccounted for currency, contraband and/or weapons with negative results.  DEA agents provided the CS with audio and video recording equipment and $500 of previously recorded currency. The CS had previously communicated with PICHARDO-MENDEZ earlier that day via text message and had arranged to meet with PICHARDO-MENDEZ to purchase fentanyl in Hookset, New Hampshire.  PICHARDO-MENDEZ responded back to the CS via text and agreed to meet the CS at the Walmart located at 3 Commerce Drive in Hookset, New Hampshire.

18.     In anticipation of this meeting, DEA agents established surveillance around the Walmart parking lot in Hooksett.  A few minutes later, additional DEA agents followed the CS from the neutral location to the Walmart parking lot where the CS parked its vehicle.

19.     A short time later, the DEA surveillance team observed PICHARDO-MENDEZ's white Volvo arrive in the Walmart parking lot and park near the CS' vehicle.  Next, DEA agents

observed the CS enter the passenger side of the white Volvo. A few minutes later, the same agents observed the CS get out of the white Volvo and return to the CS vehicle. Agents then observed the white Volvo leave the Walmart parking lot and followed it to the N. Russell Street Residence. PICHARDO-MENDEZ was then observed entering the residence.

20.     Meanwhile, other agents met with the CS at a neutral location. At this time, the CS relinquished custody of the audio/video recording equipment, $250 in currency, and a small clear plastic bag containing a substance that later field tested positive for the presence of fentanyl. The CS indicated that the CS had purchased the fentanyl from PICHARDO-MENDEZ inside the white Volvo in exchange for $250. PICHARDO-MENDEZ told the CS that he could provide the CS with additional quantities of fentanyl if the CS was willing to travel to another address.

21.     At the direction of agents, the CS called PICHARDO-MENDEZ  who informed the CS that he would text the CS an address where the CS could obtain more fentanyl. Investigators monitored this conversation. Following this call, the CS received the following incoming text message from PICHARDO-MENDEZ that read, "16 gates st Manchester (sic)". The CS and the CS' vehicle were then searched by agents with negative results for unexplained currency, contraband and/or weapons. Agents also provided the CS with audio/video recording equipment and $250 in serialized currency after which investigators instructed the CS to travel to the Gates Street Residence to purchase additional fentanyl. DEA agents then established surveillance around the area of the Gates Street Residence during which DEA agents observed the black Honda parked in front of the Gates Street residence. This vehicle is registered to PICHARDO-MENDEZ.

22.    Other DEA agents followed the CS' vehicle to the area of the Gates Street Residence where the CS parked the vehicle on Gates Street.  According to the CS, while parked, an unknown female ("UF") exited the Gates Street Residence and entered the CS vehicle.[10] Agents then observed the CS drive around the block and return to the Gate Street Residence. The CS later told agents that while in the CS vehicle, the UF provided the CS additional substances that field tested positive for fentanyl in exchange for $250.  The CS then observed the UF exit the CS vehicle and enter the Gates Street Residence.  Agents then observed the CS depart from the area.  A short time later, DEA agents met with the CS again at a neutral location where the CS relinquished custody of the fentanyl and the audio/video recording devices. Agents then searched the CS and CS vehicle again with negative results.

23.    On January 27, 2021 and January 28, 2021, DEA directed the CS to communicate with PICHARDO-MENDEZ via text message to order another purchase of fentanyl on January 28, 2021.

24.    Later in the day on January 28, 2021, DEA agents met the CS at a neutral location and instructed the CS to send a text message PICHARDO-MENDEZ to confirm their meeting. During these text messages (again in Spanish), the CS asked PICHARDO-MENDEZ if they would be meeting at Walmart.  PICHARDO-MENDEZ informed the CS that they would meet at the residence of the female which the CS understood to mean the Gates Street Residence. The CS and CS' vehicle were searched with negative results for contraband and/or weapons.  DEA provided the CS with audio/video recording equipment and $500 in serialized currency

---

[10] DEA surveillance units did not observe the female enter or exit the residence due to darkness and the surveillance location.

25.     In anticipation of the CS meeting with PICHARDO-MENDEZ, DEA agents established surveillance around the area of the Gates Street Residence. At this time, DEA agents observed the black Honda SUV parked in front of the residence.  The CS was subsequently followed by a DEA agent from the neutral location to the area of Gates Street.

26.     Prior to the CS arriving at Gates Street, agents observed the white Volvo arrive and park across the street from the Gates Street Residence.  Agents observed PICHARDO-MENDEZ, wearing an orange sweatshirt, and an UF exit the white Volvo as the CS arrived and parked in the driveway of 16 Gates Street.  Agents observed PICHARDO-MENDEZ and the UF enter a side door connected to 16 Gates Street.

27.     Moments later, DEA agents observed PICHARDO-MENDEZ exit the Gates Street Residence and enter the front passenger seat of the CS' vehicle.  A few minutes later, DEA agents observed PICHARDO-MENDEZ exit the CS vehicle and again enter 16 Gates Street.  At this time, the CS left the area and was followed by DEA agents back to a neutral location.

28.     Agents met with the CS who relinquished custody of the audio/video recording equipment and a substance that later field tested positive for the presence of fentanyl.  The CS and the CS' vehicle were searched again with negative results for contraband.  The CS informed agents that PICHARDO-MENDEZ provided the CS with the agreed upon quantity of fentanyl in exchange for the $500 serialized currency and that PICHARDO-MENDEZ "fronted" the CS an additional quantity of fentanyl for the CS to pay PICHARDO-MENDEZ later. A DEA employee fluent in Spanish corroborated the CS's rendition of these events from the recording of the conversation.

10

29.     On February 9, 2021, investigators directed the CS to place a call to PICHARDO-MENDEZ.  This call was monitored and recorded by DEA. During this call, PICHARDO asked the CS to call him call on his other cellular phone.  Minutes later, the CS placed a call to PICHARDO-MENDEZ.  This call was also monitored and recorded.  During this call, the CS told PICHARDO-MENDEZ in part, "I have a little something for you", meaning money owed to PICHARDO-MENDEZ for the extra fentanyl the CS had received on January 28, 2021.  The CS went on to ask what time he/she should come to see PICHARDO-MENDEZ the following day.  PICHARDO-MENDEZ indicated that he would be available and said in part, "That's fine, whenever you want.  I'm going to be near here."

30.     On February 10, 2021, an investigator instructed the CS to place a text message in Spanish to PICHARDO-MENDEZ to inform him that the CS would be in the area between 1:30 p.m. and 2:00 p.m. that day.  PICHARDO-MENDEZ replied back in Spanish via text, "Ok. How much are you going to bring me".  The CS responded back, in part, "half".  PICHARDO-MENDEZ sent a text back that said, "Ok".

31.     At approximately 1:10 p.m. that day, members of the DEA conducted a drive-by of 16 Gates Street and observed the white Volvo station wagon parked at the residence.

32.     At approximately 1:15 p.m., agents met with the CS at a neutral location.  The CS was instructed to send a text message to PICHARDO-MENDEZ in Spanish that read, in part, "like in 15 min I arrive.  Where I see you".  PICHARDO-MENDEZ answered, "Go where the friend Mia Tuva will want to take you something".  The CS understood this to mean that PICHARDO-MENDEZ wanted the CS to go to where they had previously met at the Gates

Street Residence and that the CS would meet with PICHARDO-MENDEZ's female associate who the CS previously met on January 21, 2021.

33.     The CS also informed PICHARDO-MENDEZ via text, "I only have 500", meaning the CS only had $500.00 to give PICHARDO-MENDEZ.  PICHARDO-MENDEZ texted back, "Ok".  At approximately 1:39 p.m., the CS sent PICHARDO-MENDEZ a text that read, in part, "I'll shoot you when I'm outside" meaning the CS would text PICHARDO-MENDEZ when the CS was outside of the Gates Street Residence.  Agents then searched the CS with negative results for contraband, unaccounted for currency and/or weapons.  Agents also provided the CS with audio and video recording equipment and $500.00 of previously recorded serialized funds and instructed the CS to travel with an undercover agent to the Gates Street Residence to meet with PICHARDO-MENDEZ's female associate.

34.     At approximately 1:45 p.m., members of the DEA established surveillance around the area of 16 Gates Street in Manchester.  At this time, agents observed that PICHARDO-MENDEZ's white Volvo was no longer parked at the residence.

35.     At approximately 1:46 p.m., the CS departed the neutral location in the undercover agent's vehicle and was followed to Gates Street by this an agent from the DEA.

36.     At approximately 1:50 p.m., the CS arrived at the Gates Street Residence and sent a text in Spanish to PICHARDO-MENDEZ stating, "I'm out" indicating that the CS was outside 16 Gates Street.  A few moments later, the undercover agent observed the CS exit the vehicle and enter the front door of the Gates Street Residence. A short time later, the undercover agent observed the CS exit 16 Gates Street and return to the vehicle.

37.    The undercover agent then departed the area with the CS. An agent then met with the CS and the undercover agent at a neutral location. At this time, agents took custody of the audio/video recording equipment. The CS also gave investigators a substance that later field tested positive for fentanyl. Agents then searched the CS with negative results for additional contraband.

38.    The CS stated that upon entering the residence he/she was met in the hallway of the first floor by the same UF ("UF"). The CS indicated that he/she gave the UF the $500 in previously recorded serialized currency as a partial payment for the fentanyl received on January 28, 2021. According to the CS, the UF indicated that she had something to give the CS but had grabbed the wrong thing and went upstairs while the CS waited in the hallway of the first floor of the Gates Street Residence. The CS explained that the UF returned a short time later and handed the CS the fentanyl. The CS then left the residence and returned to the undercover vehicle. At approximately 2:09 p.m., the CS sent PICHARDO-MENDEZ a text message in Spanish thanking him and saying that the CS would contact PICHARDO-MENDEZ next week.

39.    After reviewing the audio/video recordings of the meeting between the CS and UF, investigators compared the images of the UF to an expired Massachusetts driver license photo for ORTEGA and confirmed that the UF the CS had met with was in fact ORTEGA. An open-source query revealed that ORTEGA has a listed address of 16 Gates Street, Floor 2, Manchester, New Hampshire. Also, a utility check of 16 Gates Street revealed that the person listed on the account for apartment 2 is Oscar ORTEGA-MERCADO.

40.    On February 18, 2021, at approximately 12:26 p.m., members of the DEA established surveillance around the Gates Street residence and observed PICHARDO-

13

MENDEZ's white Volvo.  At 12:28 p.m., agents observed a Hispanic male believed to be

PICHARDO-MENDEZ, wearing an orange sweatshirt and black pants, enter the white Volvo

and depart the area.

41.     At approximately 12:30 p.m., agents met with the CS at a neutral location. At the

direction of agents, the CS exchanged text messages in Spanish with PICHARDO-MENDEZ

to confirm a meeting between them later that day and the CS told PICHARDO-MENDEZ that

the CS would pay back $500 for the drugs acquired during their previous meeting on February

10, 2021.   In these text messages, the CS informed PICHARDO-MENDEZ that he/she would

be arriving in 15 minutes and PICHARDO-MENDEZ replied "Okay, go to the girl's place. How

much you bringing me?" The CS and agents understood that the "girl's place" was referring to

the Gates Street Residence. The CS responded with "500. I'll let you know when I'm

outside".  Agents searched the CS and CS vehicle with negative results for contraband,

unexplained currency and/or weapons.  Agents also provided the CS with audio and video

recording equipment and $500 of previously recorded serialized funds.

42.     At approximately 12:50 p.m., the CS departed the neutral location and was

observed driving to the area of 16 Gates Street.  Agents observed the CS park his/her vehicle on

the street and enter the Gates Street Residence a short time later.  A few moments later, the CS

exited the residence, entered the CS vehicle, and departed the area followed by agents.

43.     Upon meeting with agents at a neutral location, the CS relinquished custody of a

substance that subsequently field tested as fentanyl.  Agents also took custody of the audio/video

recording equipment from the CS.  The CS and CS vehicle were also searched with negative

results for contraband.  The CS informed agents that he/she met with ORTEGA in the entryway

of the residence.  The CS indicated that he/she provided ORTEGA with the $500 in previously recorded serialized currency and ORTEGA provided the CS a substance that subsequently tested positive for fentanyl.

44.     On April 5, 2021, at approximately 5:33 p.m., DEA agents directed the CS to place a call to PICHARDO-MENDEZ.  This call was monitored and recorded by a DEA agent.  During this call, the CS spoke to PICHARDO-MENDEZ in Spanish and asked if PICHARDO-MENDEZ could provide the CS with authentic "real pills" (meaning authentic oxycodone pills).  PICHARDO-MENDEZ replied that he did in fact have some left.  The CS asked PICHARDO-MENDEZ how many he/she could purchase for $500.00.  PICHARDO-MENDEZ stated that he would sell the pills to the CS for $30.50 each and therefore the CS could purchase 16 pills from him.  The CS then said that he/she would call PICHARDO-MENDEZ tomorrow or the next day.

45.     On April 6, 2021, at approximately 5:28 p.m., DEA agents directed the CS to place another call to PICHARDO-MENDEZ.  During this call, the CS spoke to PICHARDO-MENDEZ in Spanish and asked to meet with PICHARDO-MENDEZ the following day.  PICHARDO-MENDEZ asked what the CS wanted, and the CS replied that he/she wanted to purchase $500.00 worth of pills.  PICHARDO-MENDEZ agreed, and the CS told PICHARDO-MENDEZ that he/she would call him the next morning to establish a time for the purchase.

46.     On April 7, 2021, at approximately 11:00 a.m., DEA agents surveilled around the area of PICHARDO-MENDEZ's N. Russell Street Residence. At this time, an agent observed the black Honda parked on in front of the N. Russell Street residence.

15

47.     At approximately 11:16 a.m., investigators met with the CS at a neutral

location.  At 11:19 a.m., DEA agents directed the CS was directed to place a telephone call

to PICHARDO-MENDEZ.  This call was monitored and recorded by investigators.  During

this call, the CS spoke to PICHARDO-MENDEZ in Spanish.  According to the

CS, PICHARDO-MENDEZ stated that he was on another call and said he would call the CS

back.  At approximately 11:26 a.m., after not receiving a call back, the CS was instructed to text

PICHARDO-MENDEZ and plan to meet PICHARDO-MENDEZ at the Walmart in Hooksett,

New Hampshire.  PICHARDO-MENDEZ agreed to meet the CS at Walmart in approximately 15

minutes.  The CS was then given audio/video monitoring and recording equipment by

investigators.  In addition, the CS was provided with $500.00 in official advanced funds (OAF)

and was instructed to drive to Walmart and meet with PICHARDO-MENDEZ to purchase the

pills.

48.     At approximately 11: 43 a.m., law enforcement observed the black Honda

departing the area of the N. Russell Street residence.  Agents initiated a mobile surveillance at

this time and followed the black Honda to the vicinity of Walmart in Hooksett.

49.     At approximately 11: 44 a.m., the CS departed the neutral location and was

followed to Walmart by law enforcement to the Walmart in Hooksett.  The CS arrived at

Walmart at approximately 11:47 a.m.  As instructed, the CS remained in the vehicle,

sent PICHARDO-MENDEZ a text message indicating he/she was there, and

waited for PICHARDO-MENDEZ in a parking space.  At 11:51 a.m., the CS sent a follow-up

text stating "I am parked in the same place" (meaning the CS was parked in the same place as

his/her last meeting with PICHARDO-MENDEZ at this location).

50.     At approximately 11: 54 a.m., agents conducting surveillance observed the black

Honda arrive at the Walmart and park next to the CS.  At this time, DEA agents observed the CS

exit his/her vehicle and enter the front passenger side of the black Honda.  Agents then observed

the black Honda drive around the parking lot before returning to the CS' vehicle a short time

later.  At this time, the CS was observed to exit the black Honda and then enter the CS'

vehicle.  Agents then observed the black Honda depart the parking lot.  Agents initiated a mobile

surveillance of the black Honda and followed it to a Dunkin Donuts in Manchester, New

Hampshire where the Honda was observed to enter the drive-thru lane, drive up to the window,

and depart moments later.

51.     Meanwhile, other investigators followed the CS' vehicle back to a neutral location

and then met with the CS.  At this time, investigators retrieved and deactivated the audio/video

recording and monitoring equipment previously given to the CS.  The CS then turned over a

clear plastic bag containing approximately 16 blue pills wrapped in white paper.  These pills

subsequently field tested positive for the presence of oxycodone.  The CS and the CS vehicle

were also searched by investigators with negative results for contraband.  The CS then indicated

that during his/her meeting with PICHARDO-MENDEZ, the CS provided PICHARDO-

MENDEZ with the $500.00 in OAF.  According to the CS, PICHARDO-MENDEZ then

provided him/her with the blue pills.  In addition, during this conversation PICHARDO-

MENDEZ indicated he would be traveling to the Dominican Republic in approximately two (2)

weeks.  The CS then asked if he/she could send a friend to obtain drugs from PICHARDO-

MENDEZ.  PICHARDO-MENDEZ indicated that the CS could send a friend and if

PICHARDO-MENDEZ was not available the friend would be directed to the Gates Street Residence to deal with ORTEGA.

52.     At approximately 12:15 p.m., agents conducting surveillance of PICHARDO-MENDEZ observed the black Honda arrive in the area of the Gates Street Residence.  A few moments later, law enforcement observed PICHARDO-MENDEZ enter the side entrance of 16 Gates Street.  Surveillance was then terminated.

53.     On April 18, 2021, the CS participated in a series of calls and texts with PICHARDO-MENDEZ that were not monitored or recorded.  However, according to the CS, during these calls, the CS asked PICHARDO-MENDEZ if it would be ok to give PICHARDO-MENDEZ's telephone number to an associate so that this associate could purchase pills from PICHARDO-MENDEZ.  PICHARDO-MENDEZ agreed that his telephone number could be passed to CS' associate.  The CS told PICHARDO-MENDEZ that the CS would call PICHARDO-MENDEZ again before the CS' associate contacted PICHARDO-MENDEZ.  In addition, PICHARDO-MENDEZ indicated that he would be travelling to the Dominican Republic in a day or two and would be gone for a couple of weeks.  At approximately 8:17 p.m., the CS sent a text message to PICHARDO-MENDEZ in Spanish indicating that his/her associate would "call you tomorrow afternoon".

54.     On April 19, 2021, at approximately 3:40 p.m., the CS placed a call to PICHARDO-MENDEZ.  This call was not monitored or recorded.  According to the CS, during this call, the CS informed PICHARDO-MENDEZ that his/her associate would be calling PICHARDO-MENDEZ later to set up a purchase of pills.

55.    At approximately 3:45 p.m., DEA agents established surveillance around the area of the N. Russell Street Residence. At this time, an agent observed a black Audi previously observed at this location, a Jeep Wrangler with temporary license plates, and a white Honda CRV at the residence.  The white CRV is registered to Ruth E. ORTEGA BELTRAN, DOB: 11/05/86, Address: 16 Gates Street, Apartment 2, Manchester, New Hampshire.  A short time later, an agent observed that all three vehicles had departed the area.  A short time after that, agents observed that the black Audi had returned to the residence.  DEA agents then established surveillance at the Gates Street Residence.

56.    At approximately 4:00 p.m., other members of the DEA Portsmouth TDS met with a second confidential source ("CS2") at a neutral location.[11]  During this time, CS2 and his/her vehicle were searched by investigators with negative results for contraband.  In addition, CS2 was provided with $500.00 in official advanced funds (OAF).

57.    At approximately 4:20 p.m., other investigators established surveillance at 16 Gates Street and observed the white Honda CRV parked at the residence.

58.    At approximately 4:30 p.m., CS2 placed a recorded call PICHARDO-MENDEZ and set up a purchase of counterfeit oxycodone pills.  This call was monitored by law enforcement.  During this call, CS2 spoke to PICHARDO-MENDEZ in Spanish during which

---

[11] CS2 is facing potential criminal charges based on his/her 2020 arrest by the DEA for conspiracy to distribute narcotics.  CS2 has provided information and/or active cooperation at the direction of DEA in the hopes of receiving prosecutorial and/or judicial consideration at sentencing.  Before CS2's arrest, he/she was arrested in the Commonwealth of Massachusetts for trafficking in controlled substances, possession of firearm without a permit, motor vehicle related offenses, and driving under the influence of alcohol.  I believe that the information provided by CS2 is reliable as it is consistent with other government intelligence and has been independently corroborated through this investigation and other sources.

the CS asked to meet PICHARDO-MENDEZ in order to purchase pills.  PICHARDO-MENDEZ

indicated that he would call CS2 back.  At approximately 5:00 p.m., CS2 placed another call

to PICHARDO-MENDEZ.  During this call, PICHARDO-MENDEZ agreed to meet CS2 at the

Walmart in Hooksett, New Hampshire in ten minutes.  At this time, DEA provided CS2 with

audio/video monitoring and recording equipment and instructed CS2 to drive to Walmart and

meet with PICHARDO-MENDEZ to purchase the pills.

59.    At approximately 5:07 p.m., DEA agents established surveillance at the Walmart

in Hooksett.  At approximately 5:12 p.m., CS2 departed the neutral location in his/her vehicle

and was followed to Walmart by an agent.  CS2 arrived at Walmart at approximately 5:15 p.m.

As instructed by DEA, CS2 parked in a parking spot and remained in the vehicle.  At

approximately 5:21 p.m., CS2 received an incoming call from PICHARDO-MENDEZ who

indicated that he would be arriving at the Walmart soon and would be in a Jeep.

60.    At approximately 5:25 p.m., this affiant observed the previously mentioned gray

Jeep Wrangler with temporary license plates arrive at the Walmart parking lot and park next to

CS2's vehicle.  PICHARDO-MENDEZ then exited the driver's side door of the Jeep and walked

over to the passenger side of CS2's vehicle.  Moments later, this affiant observed PICHARDO-

MENDEZ walk back to the gray Jeep, enter on the driver's side, and depart the

area.  Investigators observed the gray Jeep head south on Route 93 and then lost sight of it a

short time later.  Surveillance was terminated shortly thereafter.

61.    Meanwhile, law enforcement followed CS2 back to a neutral location and then

met with CS2.  At this time, an agent retrieved and deactivated the audio/video recording and

monitoring equipment previously given to CS2.  CS2 then turned over a clear plastic bag

20

containing approximately 31 blue pills.  These pills were later field tested positive for the

presence of cocaine.  CS2 and the CS' vehicle were also searched by an agent with negative

results for contraband.  CS2 indicated that during the meeting with PICHARDO-

MENDEZ, CS2 provided PICHARDO-MENDEZ with the $500.00 in OAF in return for pills.  In

addition, during this conversation, CS2 asked if he/she could obtain more pills

from PICHARDO-MENDEZ in the future.  PICHARDO-MENDEZ stated that he could

not provide anything to CS2 for the next two (2) weeks because he would be away.  CS2 also

stated that PICHARDO-MENDEZ arrived with a light skinned female who remained in the gray

Jeep.

62.     On May 5, 2021, at the direction of DEA agents, the CS placed several calls

to PICHARDO-MENDEZ in the Dominican Republic to arrange a purchase of approximately 60

grams of fentanyl by CS2 from PICHARDO-MENDEZ's associate.  These calls were not

monitored or recorded but the CS subsequently informed agents that PICHARDO-MENDEZ

indicated that he would have a female associate call CS2 to make arrangements for the sale of

the fentanyl.  Later that day, CS2 received an incoming call from a female believed to be

ORTEGA.  CS2 made arrangements to purchase approximately 60 grams of fentanyl from the

female and was instructed to go to the Gates Street Residence. This call was monitored by agents

and was recorded.

63.     At approximately 6:30 p.m., this affiant and another investigator met with CS2 at

a neutral location. At the direction of agents, the CS placed a recorded call with

ORTEGA to confirm their meeting for CS2 to purchase 60 grams of fentanyl for $900.

ORTEGA confirmed the meeting and instructed CS2 to meet at the Gates Street Residence.

Agents then provided CS2 with audio/video equipment. In addition, CS2 and his/her vehicle were searched with negative results for contraband. DEA provided CS2 with $1,000.

64. At approximately 6:55 p.m., CS2 departed the neutral location followed by an agent and arrived on Gates Street a short time later as observed by surveillance agents. Agents then observed CS2 park his/her vehicle across the street from the Gates Street Residence. At approximately 7:02 p.m., surveillance agents observed CS2 exit the vehicle and enter the right door located on the front porch of 16 Gates Street. At 7:04 p.m., surveillance agents observed CS2 exit the apartment building, enter CS2's vehicle, and depart the area. CS2 was followed by law enforcement back to the neutral location. At approximately 7:06 p.m., surveillance was terminated.

65. At approximately 7:10 p.m., this affiant and another agent met with CS2 at a neutral location. CS2 relinquished custody of a box containing six cylinder shaped "fingers" consisting of compressed tan powder which later field tested positive for the presence of fentanyl. Agents also took custody of the audio/video recording equipment. (Note: Agents later determined that the video equipment malfunctioned and did not record the meeting; however, the audio recordings were downloaded to a CD and entered into evidence). CS2 also returned $100.00 in OAF. Agents then searched CS2 and his/her vehicle with negative results. CS2 informed agents that he/she placed a call to the female upon arriving on Gates Street. According to CS2, he/she was told by the female that she was looking out the window and could see CS2. CS2 asked where he/she should go. The female told CS2 to enter the Gates Street residence and the female then came down and opened the door for CS2. CS2 then entered the

22

Gates Street Residence and met with the female believed to be ORTEGA.[12] CS2 climbed a set

of stairs and met with ORTEGA on the stairs just prior to the second-floor landing.  CS2 told

ORTEGA  that he/she was purchasing six (6) fingers.  ORTEGA indicated that she made a

mistake and thought it was ten (10) fingers. ORTEGA then unwrapped a package containing ten

(10) fingers, took out four (4) fingers, showed CS2 the six (6) fingers (60 grams of fentanyl), and

then handed CS2 the six (6) fingers in exchange for $900.00.

66.     On June 9, 2021 and June 10, 2021, CS2 participated in recorded telephone

calls with PICHARDO-MENDEZ and made arrangements to purchase six (6) fingers

(approximately 60 grams) of fentanyl from PICHARDO-MENDEZ for $900.00 at the Walmart

parking lot in Hooksett, New Hampshire.

67.     On June 10, 2021, at approximately 3:26 p.m., members of the DEA established

surveillance around the area of the N. Russell Street Residence.  At this time, an agent observed

a gray 2021 Jeep Wrangler bearing New Hampshire license plates number 4928144 parked in the

driveway of the residence.  This vehicle is registered to PICHARDO-MENDEZ with a listed

address of the N. Russell Street Residence.

68.     At approximately 3:57 p.m., investigators observed the black Honda pull into the

driveway of the N. Russell Street Residence.

69.     At approximately 4:57 p.m., DEA agents met with CS2 at a neutral location

and searched CS2 and his/her vehicle with negative results for contraband.  In addition, CS2 was

provided with $900.00 and audio/video recording devices.

---

[12] I believe that the female was ORTEGA based on a voice comparison between the audio recording of
this meeting and previous audio recordings between the CS and ORTEGA as well as other recorded
telephone calls with ORTEGA.

70.     At approximately 5:06 p.m., CS2 received an incoming recorded call from PICHARDO-MENDEZ during which PICHARDO-MENDEZ agreed to meet CS2 at the Walmart parking lot in Hooksett, New Hampshire in several minutes.

71.     At approximately 5:14 p.m., an agent observed the black Honda depart the area of the N. Russell Street Residence. DEA agents followed the black Honda towards the Walmart in Hooksett.

72.     At approximately 5:25 p.m., DEA surveillance agents observed the Black Honda arrive at the Walmart parking lot.  A short time later, a DEA agent observed the black Honda parked in a parking space with a male subject seated in the driver's seat.

73.     At approximately 5:28 p.m., CS2 departed the neutral location in his/her vehicle and was followed to the Walmart.  CS2 was observed to park his/her vehicle a short distance away from the black Honda.  At approximately 5:32 p.m., DEA observed CS2 exit his/her vehicle and enter the black Honda.  At approximately 5:33 p.m., DEA agents observed CS2 exit the black Honda and return to his/her vehicle.  Agents then observed the black Honda depart the Walmart parking lot.  Agents initiated mobile surveillance and observed the black Honda travel to an Irving gas station.

74.     At approximately 5:42 p.m., CS2 followed a member of the Portsmouth TDS from the Walmart parking lot back to a neutral location.  At approximately 5:44 p.m., this affiant and another agent met with CS2.  At this time, CS2 relinquished the recording devices as well as six (6) fingers which later field tested positive for fentanyl.  CS2 indicated that during the meeting with PICHARDO-MENDEZ he/she received the fentanyl from PICHARDO-MENDEZ

in exchange for $900.00.  CS2 and his/her vehicle were then searched by this affiant and another agent with negative results for contraband.

75.     At approximately 5:47 p.m., agents conducting mobile surveillance observed the unoccupied black Honda at the N. Russell Street Residence.

76.     On July 13, 2021, members of the DEA Portsmouth TDS instructed CS2 to contact PICHARDO-MENDEZ and set up a meeting in Hooksett, New Hampshire. CS2 made several monitored and recorded calls to a new phone number believed to be used by PICHARDO-MENDEZ.  This number was provided by PICHARDO-MENDEZ to the CS.

77.     During the phone calls, which were spoken in Spanish, CS2 and PICHARDO-MENDEZ confirmed they would meet at the Hannaford parking in Hookset, New Hampshire.  CS2 and PICHARDO-MENDEZ also confirmed that CS2 would purchase approximately 60 gram of fentanyl from PICHARDO-MENDEZ for $900.00.

78.     At approximately 4:15 p.m., DEA agents met with CS2 at a neutral location.  During this time, CS2 and his/her vehicle were searched by agents with negative results for contraband.

79.     At approximately 4:17p.m., other agents established surveillance around the area of the N. Russell Street Residence and in the Hannaford's parking lot.  At this time, a DEA agent observed the black Honda pull into the driveway of the N. Russell Street Residence.

80.     Meanwhile, DEA instructed CS2 to drive from the neutral location to the Hannaford parking lot. Prior to CS2 departing the neutral location, DEA agents provided CS2 with $900.00 and audio and video recording devices.  At approximately 4:55 p.m., CS2 left the meet location and traveled to the Hannaford's parking lot followed by law enforcement.  At

approximately 5:00 p.m., agents observed CS2 pull into the Hannaford's parking lot, park in a parking space, and remain in the vehicle.

81.     At approximately 5:02 p.m., surveillance agents observed the black Honda CRV depart the area of the N. Russell Street residence and followed the vehicle towards the Hannaford in Hooksett.

82.     At approximately 5:04 p.m., DEA surveillance agents observed the black Honda arrive at the Hannaford's parking lot.  A short time later, agents observed it parked in a parking space with a male subject seated in the driver's seat two spaces away from CS2's vehicle.

83.     At approximately 5:04 p.m., this affiant observed PICHARDO-MENDEZ exit the black Honda CRV and enter CS2's vehicle.

84.     At approximately 5:05 p.m., this affiant observed PICHARDO-MENDEZ exit CS2's vehicle, get back into the black Honda, and depart the area.  At approximately the same time, agents observed CS2 depart the area and observed CS2's vehicle travel to a neutral location a short time later.

85.     At approximately 5:06 p.m., the black Honda began to pull out of the parking lot. Surveillance units were able to follow the vehicle out of the lot, through local side streets of Manchester, and ultimately park in front of the Gates Street Residence. Agents then observed PICHARDO-MENDEZ exit the black Honda and walk into 16 Gates Street.

86.     At approximately 5:24 p.m., other DEA agents met with CS2 at a neutral location. At this time, CS2 returned the recording devices to agents.  CS2 also turned over six (6) fingers of suspected fentanyl to investigators.  A field test was later conducted on one of the fingers with positive results for the presence of fentanyl.  CS2 indicated that during the meeting with

PICHARDO-MENDEZ he/she received the fentanyl from PICHARDO-MENDEZ in exchange

for $900.00.  CS2 and his/her vehicle were then searched by investigators with negative results

for contraband.

87.     On August 31 and September 1, 2021, CS2 was directed by members of the DEA

Portsmouth TDS to participate in audio message, text, and phone

communications with PICHARDO-MENDEZ via WhatsApp.  The telephone calls involving the

CS and PICHARDO-MENDEZ were not recorded but the audio messages and text messages

were forwarded to this affiant and were later saved to a CD which has been designated as

evidence.  During these communications, the CS made arrangements for PICHARDO-

MENDEZ to provide CS2 with 70 oxycodone/fentanyl pills for $1000.00 at a price of

approximately $15.00 each.  The CS later made arrangements for CS2 to purchase the

pills from PICHARDO-MENDEZ on September 2, 2021 rather than September 1, 2021.

88.     On September 2, 2021, at approximately 12:16 p.m., CS2 was instructed by DEA

to call PICHARDO-MENDEZ  and confirm that he/she would be meeting with PICHARDO-

MENDEZ later that day.  During this call, PICHARDO-MENDEZ spoke to CS2 in Spanish and

stated that he would be available and asked what CS2 wanted to purchase.  CS2 indicated that

he/she wanted that same thing as last time, meaning fingers of fentanyl.  PICHARDO-

MENDEZ informed CS2 that the CS had told him that CS2 was coming to purchase

oxycodone/fentanyl pills.  CS2 indicated that he would call PICHARDO-MENDEZ back to

confirm what was to be purchased.   This telephone call was recorded.

89.     At approximately 12:21 p.m., CS2 was instructed to place another call

PICHARDO-MENDEZ at (401)442-9597.  During this call, CS2 stated that he/she was in fact

going to purchase pills from PICHARDO-MENDEZ that day.   This telephone call was recorded.

90.     At approximately 2:50 p.m., members of the DEA Portsmouth TDS established

surveillance at the residence at 1335 N. Russell Street, in Manchester, New Hampshire.  At this

time, agents observed PICHARDO-MENDEZ's gray Jeep, and his Honda CRV parked at the

residence.  Both of these vehicles are registered to PICHARDO-MENDEZ with 1335 N. Russell

Street, Manchester, New Hampshire listed as the registered address.

91.     At approximately 3:00 p.m., members of the DEA Portsmouth TDS met with CS2

at a neutral location.  At this time, CS2 and his/her vehicle were searched by this affiant and

another agent with negative results for contraband.  In addition, CS2 was provided with

$1000.00 in serialized funds and was given audio/video recording and transmitting

devices.   CS2 was then instructed to meet with PICHARDO-MENDEZ at the Hannaford

Supermarket in Hooksett, New Hampshire to purchase the oxycodone/fentanyl pills.

92.     At approximately 3:33 p.m., CS2 was instructed to place a telephone call to

PICHARDO-MENDEZ prior to leaving the neutral location.  During this call, CS2 told

PICHARDO-MENDEZ that he/she would be at the Hannaford Supermarket in about

ten minutes.  This telephone call was recorded.

93.     At approximately 3:45 p.m., this affiant and another agent followed CS2 from the

neutral location to Hannaford Supermarket in Hooksett.  At approximately 3:50 p.m., CS2 was

observed pulling into a parking space at the Hannaford Supermarket by this affiant and another

agent.  Agents observed that CS2 remained in his/her vehicle at this time.  As instructed,

28

CS2 placed a call to PICHARDO-MENDEZ and informed him that he/she had arrived. PICHARDO-MENDEZ indicated that he would be there shortly. This telephone call was recorded.

94.     At approximately 3:54 p.m., surveillance agents observed PICHARDO-MENDEZ's Jeep Wrangler leave the area of N. Russell Street and head towards the Hannaford Supermarket. Surveillance was maintained on the Jeep Wrangler as it drove to the Hannaford Supermarket. At this time, agents observed the Jeep Wrangler park a short distance away from CS2's vehicle. Agents observed that PICHARDO-MENDEZ operating the vehicle wearing a black hat and a black track suit top with white stripes on the sleeves.

95.     At approximately 3:56 p.m., agents observed CS2 exit his/her vehicle, walk over to the Jeep Wrangler, and enter the front passenger seat. At this time, agents monitoring the audio/video equipment, observed CS2 meeting with PICHARDO-MENDEZ inside the Jeep Wrangler in real time. Moments later, agents observed PICHARDO-MENDEZ handing CS2 a small blue package and CS2 was observed handing PICHARDO-MENDEZ cash.

96.     At approximately 3:59 p.m., this affiant observed CS2 exit the Jeep Wrangler and walk back to his/her vehicle. Moments later, this affiant and other agents observed PICHARDO-MENDEZ departing the area in the Jeep Wrangler. Agents maintained surveillance on the Jeep Wrangler and followed it directly back to 1335 N. Russell Street where PICHARDO-MENDEZ was observed to get out of the Jeep and approach the black Honda CRV briefly before entering the residence at approximately 4:04 p.m..

97.     Meanwhile, this affiant maintained surveillance on CS2's vehicle as it traveled back to the neutral location. Upon arriving at the neutral location, CS2 met with this affiant and

29

another agent.  At this time, agents retrieved the recording and transmitting devices from CS2 as well as 70 blue pills that later field tested positive for fentanyl.  The blue pills were contained in a clear plastic bag that was wrapped in blue tape.  The recordings from the audio/video devices were later downloaded and reviewed by this affiant.  CS2 and CS2's vehicle were also searched by agents with negative results for contraband.  According to CS2, he/she met with PICHARDO-MENDEZ and obtained the 70 pills in exchange for $1000.00.  CS2 told PICHARDO-MENDEZ that if his/her customer liked these pills then they would be purchasing a larger quantity.  CS2 then asked if PICHARDO-MENDEZ would be willing to "front" him/her fingers of fentanyl.  PICHARDO-MENDEZ said that if CS2 purchased 10 fingers of fentanyl then he would be willing to "front" CS2 an additional five (5) fingers to start.

Training and Experience Concerning Items to be Seized

98.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers in my office, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes, automobiles, garages or outbuildings on their properties, basements, or other places under their immediate control.  I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other locations they access with frequency.  Based on my training and experience, powder drugs such as fentanyl are generally brought into the region in bulk.  However, such drugs are not typically consumed by users in such high purity form.  Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level.  High purity powder drugs are reduced in

purity by the addition of dilutants.  This process is called "cutting" or "stepping on" the drug.

Other equipment, such as scales, presses, grinders, razor blades, glass panes, blenders, and

mirrors, and the like are typically used in this cutting process. Once the drug has been "cut," a

usual practice is to repackage or "press" it in smaller quantities such as ten (10) gram fingers or

other types of plastic bags for redistribution.

99.     It is generally a common practice for drug traffickers to maintain in hard copy or

on other electronic devices, records relating to their drug trafficking activities. Because drug

traffickers in many instances will "front" (that is, sell on consignment) controlled substances to

their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such

record-keeping is necessary to keep track of amounts paid and owed, and such records will also

be maintained close at hand so as to readily ascertain current balances.

100.     Drug traffickers will commonly maintain records and documents which provide a

paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual

transactions. There are many reasons why an individual will generally maintain records for long

periods of time. One reason is that the records will often seem innocuous because of their nature

(e.g. financial, credit card and banking documents, travel documents, receipts, client lists,

documents reflecting purchases of assets, personal calendars, telephone and address directories,

check books, videotapes and photographs, utility records, ownership records, letters and notes,

tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes,

packaging materials, computer hardware and software).  Second, the individual may no longer

realize he/she still possesses the records or may believe law enforcement could not obtain a

search warrant to seize the evidence.  Lastly, it is common for individuals to set aside or store

such records, and because they generally have no immediate need for the records, they are often

forgotten.  To law enforcement, however, all these items may have significance and relevance

when considered in light of other evidence.

101.    Additionally, drug traffickers must maintain telephone and address listings of

clients and suppliers and keep them immediately available in order to efficiently conduct their

drug trafficking business.  Drug traffickers may also keep lists of customers, the cars they drive,

and the phones they use in order to keep track of them.  They may also collect court papers and

other documents about customers who they believe may be cooperating with law enforcement

authorities in order to protect themselves or attempt to intimidate potential cooperators.

102.    It is also a generally common practice for traffickers to conceal at their

residences, or other places they access frequently, large sums of money, either the proceeds from

drug sales or monies to be used to purchase controlled substances.  Individuals who distribute

controlled substances often use cash or readily transported assets which are used as cash

equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because

of the illegal nature of the transactions and to lessen the possibility of a financial paper trail.

Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money

orders to pay for controlled substances.  They may also use banks and wire companies, both

foreign or domestic, to launder and transfer funds to co-conspirators.  They may also use

shipping companies and keep records of shipments of goods bought with drug proceeds.

Records relating to income and expenditures of money and wealth in connection with drug

trafficking would also typically be maintained in residences.  I know that drug traffickers

sometimes purchase real estate with suspected drug proceeds.  They may keep records of real

estate transactions, money received from rental properties, and other such documents in their residences.

103.    Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

104.    Often, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

105.    Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments.  I am aware that items such as cell phones and U.S. currency are often located in a residence or on an individual's person.

106.    Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

107.    It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

108.    I know that individuals who distribute narcotics often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers.

<u>Training and Experience on Digital Devices</u>

109.    In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

110.    As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones.  I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection.  Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

111.    In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking.  Such numbers can confirm identities of particular speakers and the occurrence of certain events.  Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

112.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

    a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

    b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

36

c.   The volume of data stored on many digital devices will typically be so large that it
    will be highly impractical to search for data during the physical search of the
    premises.  A single megabyte of storage space is the equivalent of 500 double-
    spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is
    the equivalent of 500,000 double-spaced pages of text.  Storage devices capable
    of storing 500 or more gigabytes are now commonplace.  Consequently, just one
    device might contain the equivalent of 250 million pages of data, which, if printed
    out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a
    500 gigabyte drive could contain as many as approximately 450 full run movies
    or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years
    after they have been downloaded onto a hard drive, deleted, or viewed via the
    Internet.  Electronic files saved to a hard drive can be stored for years with little
    or no cost.  Even when such files have been deleted, they can be recovered
    months or years later using readily-available forensics tools.  Normally, when a
    person deletes a file on a computer, the data contained in the file does not actually
    disappear; rather, that data remains on the hard drive until it is overwritten by new
    data.  Therefore, deleted files, or remnants of deleted files, may reside in free
    space or slack space, i.e., space on a hard drive that is not allocated to an active
    file or that is unused after a file has been allocated to a set block of storage space,
    for long periods of time before they are overwritten.  In addition, a computer's
    operating system may also keep a record of deleted data in a swap or recovery

file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and

processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.  Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

39

113.    Based on my training and experience, I believe that it is likely that the N. Russell Street Residence will contain smartphones that can be unlocked via the use of a fingerprint in lieu of a numeric or alphanumeric password. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

114.    If a user enables Touch ID on a given device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

115.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to

40

unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

116.     Although Apple's Touch ID may be the most common or well-known means for unlocking a device with a fingerprint, I am aware that other brands of smartphones like Samsung also offer a similar feature that works essentially the same way.  Therefore, when I refer to "Touch ID" I am not just referring to Apple devices, but to similar technology on all smartphones.  While I believe that the targets of this investigation likely use smartphones, I am not aware of the particular brand of phone that they use.

117.     The passcodes that would unlock the targets' devices is not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock devices with the use of the fingerprints of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

118.     Based on the facts discussed in this affidavit I believe that PICHARDO-MENDEZ is the primary user of cellular telephone numbers (603) 948-8365, (603) 400-4525, and (401) 442-9597, and thus his fingerprints are among those that are able to unlock the devices via Touch ID.  We intend to call these numbers when searching the premises where we believe PICHARDO-MENDEZ and ORTEGA reside. If the phones ring, and the user is present, I request authority to place his or her fingers on the Touch ID sensors to unlock the device.

## CONCLUSION

119.    For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 21 U.S.C. § 841(a)(1) (distribution of controlled substances), will be found by searching the locations described in Attachments A-1, A-2 and A-3.  Based upon my training and experience I believe that the items set forth in Attachments B-1, B-2, and B-3 are commonly possessed by drug traffickers in their homes, automobiles, on their cell phones, or in other places under their control and that those items are evidence of violations of the offenses being committed by PICHARDO-MENDEZ, ORTEGA, and others.


/s/ Steven Galbadis
Steven Galbadis
Special Agent
Drug Enforcement Administration


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:   **Sep 20, 2021**

Time:   **6:42 PM, Sep 20, 2021**

Hon. Andrea K. Johnstone
United States Magistrate Judge

## ATTACHMENT A-1
### N. Russell Street Residence

1335 N. Russell Street, Manchester, New Hampshire is described as a white two (2) story single family residence with an attached two (2) car garage and driveway on the left side. The number on the house is 1335.



**ATTACHMENT A-2**
**Black Honda**

A 2007 black Honda CRV bearing New Hampshire license plate number 2371002

("black Honda") registered to Juan Antonio PICHARDO-MENDEZ ("PICHARDO-MENDEZ")

at the N. Russell Street Residence.



## ATTACHMENT A-3
### Gray Jeep

A gray 2021 Jeep Wrangler bearing New Hampshire license plate number 492-8144 registered to Juan Antonio PICHARDO-MENDEZ ("PICHARDO-MENDEZ") at the N. Russell Street Residence.



**ATTACHMENT B-1**
**N. Russell Street Residence**

1.    Controlled substances including, but not limited to fentanyl and oxycodone pills;

2.    Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.    Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers believed to be used by Juan Antonio PICHARDO-MENDEZ, Ruth ORTEGA, or co-conspirators and electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.    Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books;

5.    Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.    Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

7.    Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

8.    Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

9.    Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

10.   Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11.   Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning PICHARDO-MENDEZ or ORTEGA, business entities in which they are stakeholders, or co-conspirators; and

12.   Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

13.   For the cellular telephones assigned call numbers (603) 948-8365, (603) 400-4525, and (401) 442-9597, all of which are used primarily by PICHARDO-MENDEZ, I seek to search the telephones for:

   a.   Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

   b.   lists of customers and related identifying information;

   c.   types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

   d.   any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

   e.   any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   f.   information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

   g.   all bank records, checks, credit card bills, account information, and other financial records (including on financial applications like CashApp and Venmo);

   h.   Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

During the execution of the search of the Subject Premises described in Attachment A-1 and B-1, law enforcement personnel are authorized to press the fingers (including thumbs) of PICHARDO-MENDEZ and ORTEGA, if found at the Subject Premises, to the fingerprint sensor of the devices respectively believed to be used by each of them for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

48

## ATTACHMENT B-2
**Black Honda**

1.      Controlled substances including, but not limited to fentanyl and oxycodone pills;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, zip lock bags;

3.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books;

5.      Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.      Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7.      Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2015 to the present;

8.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles or trucks purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9.   Photographs, negatives, video tapes, and films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10.  Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11.  Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12.  Indicia of possession of the place to be searched;

13.  Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers;

14.  Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

**ATTACHMENT B-3**
**Gray Jeep**

1.      Controlled substances including, but not limited to fentanyl and oxycodone pills;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, zip lock bags;

3.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books;

5.      Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.      Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7.      Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2015 to the present;

8.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles or trucks purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9.      Photographs, negatives, video tapes, and films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10.     Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers,

correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11.     Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12.     Indicia of possession of the place to be searched;

13.     Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers;

14.     Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.